**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **GARRON PAUL DAVIS,** | | |
|     **ID # 1119035** | ) | |
|       **Petitioner,** | ) | |
| **vs.** | ) | **No. 3:08-CV-0510-K (BH)** |
| | ) | |
| **NATHANIEL QUARTERMAN, Director,** | ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal** | ) | |
| **Justice, Correctional Institutions Division,** | ) | |
|       **Respondent.** | ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b) and *Special Order 3-251*, this case has been referred to the United States Magistrate Judge for findings, conclusions, and recommendation.

## I. BACKGROUND

Petitioner, an inmate currently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ-CID), filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 to challenge his conviction for murder in Cause No. F01-57118-MS. Respondent is Nathaniel Quarterman, Director of TDCJ-CID.

### A. Procedural and Factual History

On October 31, 2001, the State indicted petitioner for the murder of Zacchaeus Fisher. (Transcript at 2-3). On August 19, 2002, the case against petitioner proceeded to trial. (Tr.:4; R. 4:cover). The jury found petitioner guilty on August 21, 2004, and after hearing evidence regarding punishment, sentenced petitioner to life in prison. (R. 6:120; R. 7:103-04).

The state appellate court recounted the evidence at trial as follows:

> On September 22, 2001, the body of twenty-year-old Zacchaeus Fisher was found on 3414 Alaska Avenue in Dallas, Texas. Fisher died of ten gunshot wounds at close range, any one of which could have been fatal.

Desiree Holmes, Zacchaeus Fisher's mother, testified that the last time she spoke to Fisher was the evening of September 22, 2001.  Michelle Jackson, Fisher's aunt, also testified that she had spoken to Fisher on his cellular phone at around 11 p.m. as he was taking a car back to an individual names Craig.  During their conversation, they made plans to attend a pool party, when "his phone went dead."  Jackson attempted unsuccessfully to contact Fisher on his cell phone three or four times.

Jewel Sneed, Appellant's front-door neighbor, testified that she and her son Charles Marshall returned home on the evening of September 22, 2001 shortly after it became dark.  A large street light was located at the end of the driveway.  Sneed's son Charles backed up his vehicle in the driveway of her home, parking the vehicle facing outwards towards Appellant's residence with its headlights shining on the house.  Sneed then testified she saw Appellant come out of his house and go to the car in the driveway and get a gun.  She heard two or three gunshots while attempting to enter her home; however, she never saw Appellant or Fisher shoot.  Sneed then saw a second person at the scene but did not know whether that person was a man or a woman.  She testified she never saw anyone else other than Appellant with a weapon.

Talitha Kurkpatrick testified that she was Appellant's girlfriend and that she was at Appellant's residence when Fisher was killed.  She testified that she was at Appellant's residence where they were watching television at approximately 11 p.m.  Kurkpatrick said Appellant had been smoking crack cocaine that night and described his behavior as "weird."  She testified that Marshall backed his vehicle into the driveway across the street to where the headlight shined on the Appellant's residence.  She observed Marshall and his mother get out of the car and walk toward their home.  She testified that she saw an El Camino drive up and park next to the Appellant's house, and she noticed Fisher step out of the vehicle and walk into the yard adjacent to the Appellant's residence.  The two properties are separated by a thin metal linked fence and Fisher was standing at the fence between the two properties.  At that moment, Kurkpatrick heard Appellant ask Fisher if he knew somebody, she did not hear Fisher respond, she next saw Fisher "fall and die."  Talitha testified that Fisher did not have a weapon, and the only thing in Fisher's hands was a cell phone.  She did not observe Fisher make any movements toward the Appellant, and the only movement Fisher made was to press a button on his cell phone when it rang.  After the first shots, she noticed Appellant jump the fence that separated the two properties and continue to shoot Fisher at close range.  At this point she did not see Fisher struggle or attempt to get back up.  Appellant told her that he shot Fisher ten times. After the shooting, Talitha and Appellant left in the car that was backed in the driveway and did not return until the following morning.

Dallas Police Officer Glen Thompson testified that he was dispatched to 3414 Alaska Avenue in response to a shooting call at about 11 p.m.  Upon arriving at the

2

scene, Officer Thompson noticed the body of Zacchaeus Fisher on the ground positioned face-up with his hands on his stomach and a cell phone near the body. Officer Thompson noticed black gun powder on Fisher's torso, head, and clothing and concluded, based on his experience, that Fisher had been shot at close range. Thompson then assisted the medical examiner in securing the crime scene.

Charles Marshall testified that he and his mother arrived at his mother's residence on Alaska Avenue sometime between 10:30 and 11:30 p.m. after attending a funeral. He backed his car onto the driveway to where his front lights shined onto Appellant's residence. Marshall testified that they remained in the vehicle for a few minutes when he observed a person and a dog through Appellant's window. Several minutes later he observed Appellant come out of his house with a pistol and walk to an abandoned vehicle that was in an open field. Once at the vehicle Appellant checked the doors and trunk of the abandoned car. Marshall stated Appellant then returned to the car that was backed into the driveway and flashed his lights onto Marshall's face and then went around the vehicle and opened the trunk. A second person whom Marshall could not identify came out of the house and joined Appellant at the vehicle in the driveway. Marshall testified that he did not see the second person with a weapon. Marshall noticed an El Camino drive and park in front of the property adjacent to Appellant's house and observed one person get out of the vehicle and walk up the ramp of Georgia Jones' property. Jones was Appellant's next door neighbor. At that point, Marshall testified that he overheard Appellant call out from the trunk of the vehicle backed into the driveway to Fisher inquiring who he was. However, Marshall did not hear Fisher's response. Marshall then saw a flash from the muzzle of Appellant's pistol towards Fisher's chest a close range and saw Fisher fall to the ground. Marshall testified to hearing about nine to ten shots after a brief pause between the first several shots. The witness related that he did not witness Appellant jump the fence. During the shooting Marshall waited behind a brick wall that was at the side of his mother's house. After the shooting, Appellant and a second person drove away in the vehicle that was backed into the driveway.

Marshall then called 911 to report the shooting. During the trial, the 911 tape was admitted into evidence and played for the jury. During Marshall's 911 call, he did not disclose Appellant as the shooter.

Dallas Police Department homicide detective, Brent Maudlin, testified he responded to a crime scene at 3414 Alaska Avenue on September 22, 2001. Maudlin had been informed by other crime scene officers that Charles Marshall was a potential witness to the shooting. Maudlin met with Marshall at a remote location, a nearby gas station, because of safety concerns Marshall had regarding the shooting. During that initial interview, Marshall named Appellant as the shooter and provided Maudlin with the information on how to contact him. The next day when Appellant returned to his residence, he was arrested. Appellant's clothing was confiscated for evidence analysis. A week later, Maudlin met with Marshall and obtained a written

affidavit detailing the events of the shooting.  He also showed Marshall and Sneed a photographic line-up and they identified Appellant by circling and dating beneath his picture.

Kathy Kresse, a Dallas Police Department detective testified about the evidence she collected when she responded to the shooting at 3414 Alaska Avenue. At the scene she found five .9 mm shell casings near the body and along the fence. She also found a cell phone in the victim's hand.  As part of her investigation, Detective Kresse photographed the scene, the body, and the location of the shell casings.  Kresse testified she was not able to lift any latent fingerprints from any of the shell casings.  Raymond Cooper, an expert firearm and tool mark examiner, analyzed the casings which were retrieved from the crime scene and from the autopsy.  Cooper concluded that all five shell casings had been fired from a single weapon.  He was able to determine that one of the fragments came from a single weapon, a .9 mm weapon, and all the fragments came from that single weapon.

Vickie Hall, a trace evidence analyst, testified that she analyzed Fisher's hand wipings.  The hand wiping results were found to be inconclusive because only two of three elements that prove the presence of gunshot residue were found.  Antimony, lead, and barium must be found to conclude that gunshot residue was present on the victim, and to suggest that the victim either fired a gun or was close to a gun when it was fired.  Hall's findings did not exclude the theory that Fisher fired a gun; however, her findings also supported the theory that Fisher had his hands in the way or around the gun when it was fired at him.  Hall examined Fisher's T-shirt worn at the time of the shooting.  She testified that Fisher's shirt contained gunpowder at very high levels which suggested that he was shot at close range.

A forensic scientist, Katherine Long, testified regarding the DNA analysis conducted on the clothing seized from Appellant at the time of his arrest.  She explained how she received autopsy blood samples from the victim, as well as the victim's clothing and Appellant's clothing.  She testified that Appellant's clothing contained blood stains and other small blood particles.  The victim was excluded as the donor of the blood found on some parts of the back of Appellant's jeans and shirt. Long stated that the blood samples that were collected were a mixture of several DNA materials that did not allow her to conduct an accurate statistical analysis of the DNA.  As a result, Long was unable to conclude that the deceased had contributed to the blood found on Appellant's clothing.

Dallas Police Officer Willie Parham testified that on Sunday, September 23, 2001, he was dispatched to the residence on Alaska Avenue after a neighbor reported that Appellant had returned to his residence.  Parham observed a vehicle near the residence with the trunk and door open.  He also noticed Appellant inside the residence looking through bay windows.  Parham testified that he called out to Appellant to come out of the house, Appellant then yelled out an obscenity and

pointed at the officer.  According to Officer Parham, Appellant released a pit bull from the house.  Parham shot the dog after it attacked his partner and attempted to attack him.  Consequently, Parham dispatched a tactical unit to the residence and evacuated other individuals for safety concerns.  Officer Parham testified that after about forty-five minutes, Appellant came out of the residence and sprung through the backyard in an attempt to evade police until he was detained and taken into custody.

Sheila Spotswood, the medical examiner, testified regarding the autopsy that was performed by one of her colleagues.  Spotswood explained the findings of the toxicology report which found a presence of .01 percent alcohol in the body of the deceased along with a small amount of marijuana by-product.  The autopsy report established that there were a total of ten gunshot wounds to the body of the deceased.  The examiner explained that some of the gunshot wounds showed the presence of both stippling and soot.  Spotswood testified that stippling is caused when particles of gunpowder strike the skin.  She also explained how the presence of soot, which is a smoky discharge or material from a firearm, can indicate a close range of discharge.  The data from the autopsy report indicated that any of the gunshot wounds were potentially fatal.  The cause of death was "multiple gunshot wounds."

Appellant testified in his own defense.  He testified that on the night of the shooting, he noticed a BMW back up into Ms. Sneed's property.  Since the car was unfamiliar to him, Appellant became concerned and went outside to the car in his driveway.  Once inside the car, Appellant shined the headlight onto the BMW until he was able to recognize Jewel Sneed.  Appellant testified that he had been doing chores all day.  He decided to go out to a club with his girlfriend, but he first wanted to wash his car.  While Appellant was looking for cleaning supplies in the opened truck of his Lincoln Town Car, he noticed an El Camino parked in front of the next door residence. Appellant was familiar with that particular vehicle because it belong to his neighbor Craig, a drug dealer who was also known as "Fat Daddy."  Appellant decided to approach the driver of the El Camino because he wanted to buy a bag of marijuana from Fat Daddy, but when the driver approached the gate, Appellant realized that the driver was not Fat Daddy.  Appellant explained that since it was dark he did not realize that the driver was not Fat Daddy; however, he was able to notice that the driver had a cellular telephone.  The driver, Fisher, got out of the vehicle and walked to the opposite side of the fence where Appellant was standing.  Appellant testified that he called out to Fisher, "I thought you were Fat Daddy."  Fisher then pulled a gun on Appellant saying, "You know what it is."  Then he ordered Appellant to come across the fence.  Appellant complied with Fisher's commands as he was in fear of his life.  Once on the other side of the fence, Fisher pressed the pistol against Appellant's side and attempted to pat him down to search for money.  Appellant testified that a car approached them and Fisher looked up momentarily.  Since Fisher was distracted, Appellant took the opportunity to knock the pistol out of his hands and then kick him at the same time.  Appellant then grabbed for the gun and it discharged one time.  Appellant testified that he fired a

shot at Fisher because he continued to be afraid of being killed. After the first shot was fired, Appellant stated that Fisher moved backwards slightly, but continued standing. Appellant then testified to firing two more shots because he continued to be in fear of his life. He could not explain why the medical examiner found Fisher had been shot ten times. Appellant also denied that he had been smoking crack on September 22, 2001–the night of the shooting. After shooting Fisher, Appellant stated that he threw the gun to the ground and fled the scene with his girlfriend in the Lincoln Town Car.

Appellant testified that he fled from the residence and passed by later that night and noticed it was surrounded by police. He did not stop because he was afraid of going to jail. The following morning when the police arrived at Appellant's house, he was uncooperative and fled on foot through the backyard of his residence. He testified that he fled because he wanted to be arrested in the presence of other witnesses. Appellant denied that he refused to come out of his house the day after the murder or that he used profanity toward the police. A police videotape was submitted to the court which depicts the Appellant as uncooperative. According to Appellant, when policed [sic] arrived the next day at his house, he came out willingly with his hands raised. He admitted that he did not claim he was the victim of an aggravated robbery when he was first questioned by police.

In rebuttal of Appellant's case, Dallas Police Department Detective Kenneth Penrod testified regarding Appellant's prior voluntary statement. Detective Penrod testified that after the Appellant's arrest, he advised him of his *Miranda* rights and had him sign and date a statement that he understood those rights. Penrod then questioned Appellant concerning the shooting. Detective Penrod recalled that Appellant initially denied any involvement in the shooting; however, once he was confronted with the fact that his girlfriend had said he was the shooter, Appellant finally admitted that he had shot Fisher. Penrod wrote out a statement that Appellant dictated by him. Appellant refused to have his admission that he shot Fisher included in the written statement. Penrod testified that neither verbally nor in the written statement did Appellant ever indicate to him that Fisher had a gun. During questioning with Detective Penrod, Appellant never stated that he struggled with Fisher or feared for his life at any point.

*Davis v. State*, No. 08-02-00421-CR, slip op. at 1-10 (Tex. App.–El Paso, August 31, 2004, pet. ref'd).

At the punishment phase of the trial, the State presented evidence that an assault rifle, a shotgun, a revolver, and a box of ammunition were recovered from the house where petitioner lived (R. 7:9-10, 40). It also presented evidence that on the same day of the fatal shooting, petitioner had

fired a gun from his car outside of an apartment complex and shot three people at approximately 7:00 a.m. (R. 7:24-30, 31-33), he had pulled a gun on a neighbor who was trying to talk to him around noon (R. 7:17-19), and he had pointed two guns at a car attempting to turn around in his driveway at 7:00 p.m. (R. 7:48-49). The State also presented evidence that on February 14, 2000, petitioner was arrested for driving a vehicle with a registration sticker that belonged to another vehicle, and that crack cocaine and a loaded weapon were found inside of the vehicle. (R. 7:58-61, 70-1). Finally, the State presented evidence that petitioner had previously been convicted three times for unlawful carrying of a weapon, seven times for driving with a suspended license, three times for evading arrest, twice for felony thefts, and also for failing to identify a fugitive and possession of marijuana. (R. 7:80-84).

In his direct appeal, petitioner contended that the evidence was legally and factually insufficient to support his conviction and that the trial court erred in admitting certain autopsy photographs. *Id.* The Eighth District Court of Appeals affirmed petitioner's conviction in an unpublished opinion. *Id.*

Petitioner filed a state habeas application for writ of habeas corpus on November 21, 2005. (S.H.Tr.:2-95).[1] On January 16, 2008, the Court of Criminal Appeals denied the application without written order on the findings of the trial court without a hearing. (S.H.Tr.:cover).

Petitioner filed an initial petition on March 21, 2008, when he signed and placed it in the prison mail system. (Pet. Writ of Habeas Corpus (Pet.) at 9); *see also Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999) (recognizing that prisoners file their federal pleadings when they place them in the prison mail system). Petitioner filed a corrected petition on April 24, 2008. Respondent filed

---

[1] "S.H.Tr." refers to the state habeas transcript for petitioner's state writ cause #WR-67,876-01.

7

an answer on August 21, 2008, and provided the state court records.

## B.  Substantive Issues

In his petition, petitioner claims that he is being held unlawfully on the following bases:

1) his conviction was obtained through the use of tainted evidence because the autopsy report and photographs were altered to show that petitioner shot the victim ten times, when he only shot him five times;

2) his conviction and punishment were a result of prosecutorial misconduct because the prosecution failed to inform the jury of all facts to be proven, withheld evidence, and made improper closing statements at both stages of the trial; and

3) his trial counsel provided ineffective assistance of counsel at trial.

Respondent contends that petitioner has failed to exhaust portions of his prosecutorial misconduct and ineffective assistance of counsel claim.  Respondent also argues that petitioner is procedurally barred from raising his claim that the prosecution committed misconduct by making improper closing arguments.

## II. PROCEDURAL BAR

Respondent  argues that petitioner is procedurally barred from raising his claim that the prosecution committed misconduct by making improper closing arguments because it was denied at the state habeas level on the basis of an independent and adequate state procedural bar. Specifically, respondent contends that this claim was determined to be barred at the state habeas level because it was not, and should have been, raised on direct appeal.

The Supreme Court has held that, when a claim was dismissed by a state court pursuant to an independent and adequate state procedural rule, federal habeas review of that claim is barred unless the prisoner can establish either cause for the default as well as actual prejudice as a result of the alleged violation of federal law *or* that failure to consider the claims would result in a

fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989). To satisfy the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61 F.3d 333, 338-39 (5th Cir. 1995).

The state habeas court concluded that petitioner's claim of improper prosecution closing arguments was not cognizable because it was not, and should have been, raised on direct appeal. (S.H.Tr.:135). The state habeas court also concluded that the claim was without merit because the arguments were proper and reasonable deductions from the evidence. *Id.* In *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000), however, it held that unless cause and prejudice is established for the default, federal courts are precluded from reviewing the merits of a claim that was determined to be procedurally barred at the state habeas level because it was not raised on direct appeal, even where the merits were also reached by the state habeas court. Accordingly, because petitioner has neither alleged nor shown cause and prejudice or a fundamental miscarriage of justice, his claim that the prosecutors committed misconduct by making improper closing arguments is procedurally barred.[2]

---

[2] Even if considered on its merits, as in *Soria*, this claim fails. Petitioner asserts that the prosecution's closing statements at the guilt phase were improper because they included the prosecutors' personal opinions and beliefs, misstated facts, referred to petitioner's prior convictions, and vouched for an eyewitness. He asserts the prosecution's closing statements at the punishment phase were improper because they included comments appealing to passion and prejudices of the jury, personal opinions and beliefs about the evidence, comments about personal safety and the safety of the community, and comments as the conscience of the community. Under state law, the four general categories of permissible closing statements are summations of the evidence, reasonable deductions from the evidence, answers to the arguments of opposing counsel, and pleas for law enforcement. *See Bell v. State*, 724 S.W.2d 780, 802-03 (Tex. Crim. App. 1986). The arguments petitioner complains of are summations of, and reasonable deductions from, the evidence. (R. 6:104-105). Because petitioner testified at the guilt phase and claimed self-defense, his credibility as a witness and prior felony convictions were an issue at trial and therefore a proper subject for closing arguments. (R. 6:113-119). At the punishment phase, the prosecutors made proper pleas for law enforcement, asking the jury to put a career criminal behind bars, ensure the safety of other citizens, and punish petitioner for the death of the victim and its effect on the victim's family. (R. 7:92-94, 101-103). This portion of petitioner's prosecutorial misconduct claim is without merit.

## III. AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996. Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions. Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

In this case, the denial of petitioner's state writ constitutes an adjudication on the merits of the claims fairly presented to the Texas Court of Criminal Appeals in such writ. The AEDPA standards enumerated in 28 U.S.C. § 2254(d) thus apply to the claims raised in petitioner's federal petition.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to

that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## IV.  TAINTED EVIDENCE

In his first ground for relief, petitioner asserts that the state knowingly or unknowingly presented altered or falsified evidence because the victim's body was altered and the autopsy report

was falsified to reflect that the victim was shot ten times, when petitioner shot him five times. Petitioner further states that the X-Rays would contain the evidence needed to support this assertion, but they were not provided to the defense before trial or entered into evidence at trial.

At the state habeas level, the trial court found that petitioner has failed to meet his burden of proof on this issue because, other than petitioner's own speculation, there was no evidence that the autopsy report was in any way falsified or altered.  (S.H.Tr.:134).  The Court of Criminal Appeals denied relief on this ground.  This conclusion is not contrary to federal law.

The Supreme Court has held that the presentation of false evidence at trial, as well as the admission into evidence at trial of false evidence that although not solicited, is not corrected, violates a criminal defendant's due process rights, if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  Petitioner has presented no evidence that "tainted" or false evidence was presented at trial, however.  The medical examiner testified about the autopsy conducted on the victim, an external evaluation of the victim revealing ten gunshot wounds, and the location on the body of each of the ten gunshot wounds, including five shots to the head (two through the back of the head), two to the chest, one to the abdomen, and one in each of the arms.  (R. 6:8-29).  The autopsy report itself was admitted into evidence at trial. (R. 8:State's Ex. ##48-51, 53-56, 60-63, 65, 67,78).  It states that six bullets and a bullet fragment were recovered from the victim (R. 8:State's Ex. #78), and these items were also admitted into evidence at trial. (R. 8:State's Ex. ##91-97).[3]  Petitioner's self-serving statement that he shot the victim five times rather than ten is not evidence that the autopsy report, the numerous photographs of the victim taken at the autopsy, and the *seven* bullets and fragments taken from the

---

[3]  The remaining bullets appeared to have exited the body through exit wounds. (R. 8:State's Ex. #78).

victim's body were tainted or false evidence.  While petitioner requests that this Court permit

discovery so that he may obtain X-Rays of the victim and the hospital intake report in order to prove

his claim that the victim was shot twice, he presents no evidence that any X-Rays exist that would

support his claim.  According to the testimony at trial, the victim was found dead at the scene, his

hands were bagged to preserve evidence, and he was taken away by the medical examiner.  (R. 4:69-

70).  He was not taken to any hospital.  Finally, petitioner's girlfriend testified at trial that petitioner

told her that he had shot the victim ten times. (R. 4:58).  This ground for relief is without merit and

should be denied.

## V.  PROSECUTORIAL MISCONDUCT

In his second ground for relief, petitioner asserts that the prosecution committed misconduct

at both the guilt and punishment phases of the trial.[4]

### A.  <u>Opening Statement</u>

Petitioner first contends that the prosecution engaged in misconduct during the opening

statement at the guilt phase of the trial by informing the jury about the elements of the crime of

murder but not previewing the evidence that would be presented at trial, including the autopsy report

showing that petitioner shot the victim ten times.  Petitioner asserts that this relieved the State of

proving the elements of the indictment beyond a reasonable doubt. (Brief at 2-3).

The record from the trial reflects that one of the prosecutors read the indictment to the jury,

---

[4] Notwithstanding respondent's contention that this claim is partially unexhausted, the claim is more easily resolved on the merits, so the Court bypasses the procedural issue.  *See* 28 U.S.C. § 2254(b)(2) (providing that  the Court may deny a habeas petition on the merits despite lack of exhaustion); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998) (reaffirming pre-AEDPA law that "when, as in this case, exhaustion is not waived, courts have the 'discretion in each case [under § 2254(b)(2)] to decide whether the administration of justice would be better served by insisting on exhausting or by reaching the merits of the petition forthwith'"); *Braswell v. Dretke*, No. 3:02-CV-0342-M, 2004 WL 2583605, at *4 (N.D. Tex. Nov. 12, 2004) (findings, conclusions, and recommendation which recognizes that "the district courts may deny habeas relief for procedurally defaulted claims" in lieu of deciding the issue of procedural bar), *accepted by* 2005 WL 1058865 (N.D. Tex. May 2, 2005).

but the State did not make any opening statement.  (R. 4:15).  The state habeas court found that this claim had no merit, and the Court of Criminal Appeals denied relief on its merits.  This decision is not contrary to federal law.  Petitioner cites to no support for his assertion that the prosecution was required to inform the jury during its opening statement all of the evidence to be presented at trial, including that the victim was shot ten times.  State law requirements are met when the indictment is read to the jury, *Sanders v. State*, 688 S.W.2d 676, 678 (Tex. App.–Dallas 1985, pet. ref'd), and this was done in this case.  Moreover, the jury was charged regarding the requirement that all of the elements of the indictment must be proven by the State beyond a reasonable doubt. (Tr.:46).  The State's burden was therefore not lessened because an opening statement was not made.

**B.**    **Brady Claim**

Petitioner next contends that the prosecution withheld exculpatory evidence when it did not provided X-Rays from the victim's autopsy to the defense.  He claims that the X-Rays would have shown that he shot the victim five, not ten, times, as reflected in the autopsy report and the photographs of the victim taken during the autopsy.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), suppression of evidence favorable to the accused and material to either guilt or punishment violates a defendant's due process rights under the federal constitution.  *Brady* requires the prosecution to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985).  Such evidence is material if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678; *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998).

14

Here, Talitha Kurkpatrick testified that petitioner told her that he had shot the victim ten times, and Charles Marshall testified that he heard nine or ten gunshots (R. 4:58, 83 ). The state habeas court found that petitioner had failed to meet his burden of proof on this issue as there is no evidence, other than petitioner's own speculation, that the autopsy report itself was falsified or altered. (S.H.Tr.:135). The Court of Criminal Appeals denied relief on this issue, and this is not contrary to federal law. Petitioner has failed to present any evidence that the X-Rays, as opposed to both the autopsy report and photographs of the victim, which were all admitted into trial, would be exculpatory because they would show fewer gunshot wounds. Accordingly, petitioner has failed to present any evidence that the prosecution violated *Brady*.

Moreover, petitioner has failed to show that such evidence would be material. He states that ten, as opposed to five, gunshot wounds made the crime appear more heinous, but petitioner himself admits that he shot the victim in the center of the forehead, twice in the chest, once in the stomach, and once in the shoulder. (Pet. at 7). The medical examiner testified that any one of nine of the ten gunshot wounds to the victim could have been fatal, and the five shots to the head and neck and the two shots to the chest would have been rapidly lethal. (R. 6:29-30). Although petitioner claimed self-defense at trial, he has failed to show how five shots would have been considered so much less heinous by the jury that there is a reasonable probability that the jury would have believed his self-defense claim and declined to convict him of murder. Petitioner has failed to establish prosecutorial misconduct, this ground for relief is without merit, and it should be denied.

## VI.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Within his third ground for relief, petitioner asserts fourteen claims of ineffective assistance

15

of trial counsel in his initial federal petition.[5]  Specifically, petitioner alleges that his attorney:

–failed to contest the admissibility of the State's evidence and failed to have the trial judge render a ruling on pre-trial motions (claims one and two);

–failed to interview any of the State's witnesses prior to trial (claim three);

–failed to visit the crime scene prior to trial (claim four);

–failed to consult adequately with petitioner prior to trial (claim five);

–failed to object to hearsay statements made by State's witness Talitha Kurkpatrick at the guilt phase of the trial (claim six);

–failed to object to the prosecutor questioning petitioner about his prior convictions during his testimony at the guilt phase of the trial (claim seven);

–failed to cross-examine eight of the State's seventeen witnesses at the guilt phase of the trial (claim eight);

–failed to consult, hire and call expert witnesses for the defense at the guilt phase of the trial (claim nine);

–gave an ineffective closing argument at the guilt phase of the trial (claim ten);

–failed to contest the admissibility of extraneous offenses at the punishment phase of the trial (claim eleven);

–failed to cross-examine eight of the State's thirteen witnesses at the punishment phase of the trial (claim twelve);

–gave an ineffective closing argument at the punishment phase of the trial (claim thirteen); and

–failed to object to the punishment jury charge and/or request a jury instruction on "sudden passion" (claim fourteen).

## A.    <u>Applicable Law</u>

To successfully state a claim of ineffective assistance of counsel under Supreme Court prece-

---

[5] Respondent also contends that this claim is unexhausted in part.  As with the prosecutorial misconduct claim, the Court proceeds to the merits.  *See* 28 U.S.C. § 2254(b)(2).

dent, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689. Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96.

Petitioners must "affirmatively prove prejudice." *Id.* at 693. They cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations, furthermore, are insufficient to obtain habeas relief. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

**B.**     **Pre-trial representation**

Petitioner first contends that his counsel provided ineffective assistance of counsel by failing to contest the admissibility of the State's evidence, to have the trial render a ruling on pre-trial motions, to interview any of the State's witnesses prior to trial, to visit the crime scene prior to trial, and to adequately consult with petitioner prior to trial.  Petitioner claims that his attorney should have gotten pre-trial rulings on the admissibility of the police videotape that showed petitioner running from the police, the testimony from police officers who arrested and questioned petitioner about his demeanor and his statement about the shooting, and extraneous offenses admitted at punishment.  He should have interviewed the State's witnesses so that he would have known what their testimony was going to be, obtained photographs of the scene reflecting that it was not a well-lit area, discussed the State's case and possible defenses with petitioner prior to trial, and informed petitioner that he could testify at the punishment phase of the trial. (Brief at 21-27).

At the state habeas level, trial counsel submitted an affidavit stating that he employed a private investigator who visited the scene, interviewed witnesses, and reported his findings to him, and counsel reviewed numerous photographs of the scene as it existed at the time of the offense. (S.H.Tr. Supp. [WR-67,876-01], dated 8/8/07).  The affidavit further states that if there were any State's witnesses who were not interviewed prior to trial, it did not affect his ability to present a defense because petitioner admitted shooting the victim but asserted self-defense and testified at trial.  The affidavit also states that counsel and his investigator were unable to locate any witnesses to corroborate petitioner's version of events. *Id*.  Finally, the affidavit states that he informed petitioner of the nature and strengths of the State's case against him and informed him that he had a right to testify at punishment. *Id*.

18

*1. Admissibility of Evidence*

With regard to petitioner's claim that counsel failed to obtain pre-trial rulings on the admissibility of the police videotape depicting petitioner's arrest, the admissibility of the testimony of the officers who arrested and questioned him about his demeanor and his statements about the shooting, and the admissibility of extraneous offenses at the punishment phase of the trial, the state habeas court found that all of this evidence was admissible at trial, and that any objection either before or during trial would have been overruled. (S.H.Tr.:128-29).  The Court of Criminal Appeals denied relief on the merits, and this decision is not contrary to federal law.

In federal habeas proceedings the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995).  The state habeas court found that all of this evidence was admissible at trial and trial counsel was therefore not ineffective for failing to contest the admissibility of the evidence.  In particular, the videotape and the testimony of arresting officers were admitted as evidence that petitioner barricaded himself in his house and resisted arrest the following day, thus contradicting his claim of self-defense (R. 5:82-87, 89-92, 95-103),  the testimony of the police officer who took a statement from petitioner in which he never mentioned self-testimony was admitted as rebuttal testimony after petitioner testified (R. 6:93-101), and the evidence of extraneous offenses admitted at punishment were admitted pursuant to Article 37.07 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon 2007).   Trial counsel was not ineffective in this regard.

*2. Interview Witnesses and Visit Crime Scene*

Petitioner next contends that his attorney was ineffective for failing to interview the State's

witnesses prior to trial to become aware of their testimony and to visit the crime scene and take photographs in order to show that the area is not well-lit.  The state habeas court found that petitioner did not identify the evidence that would have been discovered through pre-trial interviews with State's witnesses and therefore failed to meet his burden of proof.  (S.H.Tr.:129).  It also found that counsel brought out the issue of visibility during trial, pointing out that the photographs offered by the State were taken in daylight and therefore not reflective of lighting conditions that night.  The state court also found that counsel was not ineffective for failing to obtain pictures of the scene at night. (S.H.Tr.:129-30).  The Court of Criminal Appeals denied relief on the merits, and this decision is not contrary to federal law.

To show prejudice from an alleged failure to investigate, a movant "must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of the proceeding.  *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).  Moreover, if counsel has made an adequate investigation, an informed decision made based on trial strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753 (5th Cir. 2003), *cert. denied*, 540 U.S.  11865 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).  The record shows that defense counsel hired an investigator who visited the crime scene and interviewed witnesses, and that the defense was unable to locate any witnesses that would corroborate petitioner's story.  Petitioner has not alleged with any specificity how any interviews that were allegedly not conducted would have altered the outcome of his trial, and he has therefore failed to show any prejudice.  Regarding photographs of the crime scene, photographs were admitted into

evidence that were taken by the police that evening when they responded to the 911 call. (R. 4:63-4; R. 8:State's Ex. ##2-10, 15-17, 23).  Photographs taken the following day were also admitted into evidence. (R. 8:State's Ex. ##24-32).  Defense counsel also argued during his closing that it was dark at the time of the shooting and there was distance between petitioner's house and the house across the street such that Charles Marshall believed that the other person who was with petitioner was a man, so Marshall could not see what occurred across the street.  (R. 6:110-112).  Counsel also argued that the State had failed to present photographs that illustrated what the lighting was at night in that location. (R. 6:112).  Petitioner has not shown that counsel's strategic decision to argue that it was too dark to see clearly at the time the shooting occurred and to fault the State for failing to present photographs showing the lack of lighting was so poorly chosen that it permeated the trial with unfairness.  Trial counsel was not ineffective for this reason.

### 3.  Consult with Petitioner

Petitioner further claims that his attorney was ineffective for failing to meet with him enough times before trial, for failing to advise him that he could question State's witnesses and present evidence at the examining trial, for failing to advise him about the particulars of the State's case, and for failing to advise him that he could testify at the punishment phase of the trial.  The state habeas court found counsel's affidavit to be credible and that counsel discussed the nature and strengths of the State's case with petitioner and informed him of his right to testify at punishment.  The state habeas court also found that counsel adequately consulted with petitioner. (S.H.Tr.:130).  Relief was then denied by the Court of Criminal Appeal based on these findings. (S.H.Tr.:cover).  This denial is not an unreasonable application of the *Strickland* standard.

The record shows that counsel did advise petitioner of the nature and strengths of the State's

case.  Petitioner has not shown any reasonable probability that the outcome of the trial would have been different had his attorney met with him more times or had the State's witnesses been questioned or defense evidence presented at the examining trial.  The record from the trial reflects that trial counsel questioned petitioner under oath about his understanding of his right to testify at punishment and whether or not he wished to do so.  (R. 7:87-89).  Counsel was not ineffective  for failing to adequately consult with petitioner.

## C.    **Guilt Phase**

Petitioner asserts that counsel was ineffective during the guilt phase of the trial by failing to object to hearsay statements made by State's witness Talitha Kurkpatrick, failing to object to impeachment of petitioner with prior convictions, failing to cross-examine a number of the State's witnesses, failing to call expert witnesses, and giving an ineffective closing statement.

### 1.  *Hearsay Statements*

Petitioner asserts that trial counsel was ineffective for failing to object to hearsay testimony by Talitha Kurkpatrick.  He claims that counsel should have objected to her testimony that petitioner told her he had shot "the boy" ten times (R. 4:58) and to her testimony that "someone" had said that petitioner popped the trunk on his car at one point. (R. 4:55-6).

The state court found that the testimony given by Kurkpatrick that "he" told her that he had shot the victim ten times was a reference to statements made by petitioner, and the statements were therefore not hearsay under Rule 801(e) of the Texas Rules of Evidence. *See* TEX. R. EVID. 801(e)(2).  The state habeas court further found that any objection would have been overruled and concluded that counsel was not deficient for failing to object and that there was no prejudice from the failure to object. (S.H.Tr.:130-31).  The Court of Criminal Appeals denied relief on the merits

based on these findings, and this decision is not an unreasonable application of the *Strickland* standard.

Under Rule 801(e)(2) of the Texas Rules of Evidence, a statement by the opposing party in which the party "has manifested an adoption or belief in its truth" is not hearsay. *Id.*  Thus, Kurkpatrick's statement that petitioner told her she he shot the victim ten times was not an objectionable hearsay statement.  Trial counsel was not ineffective for making a meritless objection. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).  Moreover, even if a statement someone made about petitioner "popping" the trunk on his car was objectionable hearsay, petitioner has shown no prejudice because he has shown no reasonable probability that if counsel had objected and the objection been sustained, he would not have been convicted.  Any statement about him opening the trunk on his car was germane to guilt or innocence.  Petitioner himself testified that he opened the trunk of his car at one point that night to retrieve cleaning products to clean his car.  (R. 6:38). Petitioner is not entitle to relief on the basis of this claim.

    *2.  Impeachment with Prior Convictions*

Petitioner further asserts that counsel was ineffective for failing to object when petitioner was impeached by his prior convictions during cross-examination during the guilt phase of the trial. (R. 6:48-50).  The state habeas court found that petitioner's criminal record was relevant and admissible for impeachment once he took the stand under Rule 609 of the Texas Rules of Evidence, that any objection to the convictions would have been overruled, and that counsel was not ineffective for failing to make such an objection.  (S.H.Tr.:128, 131).  The Court of Criminal Appeals denied relief on the merits, and this decision is not an unreasonable application of the *Strickland* standard.

Under Rule 609 of the Texas Rules of Evidence, the credibility of a witness may be attacked with evidence that the witness has been convicted of a crime either by questioning the witness himself or through public record, if the crime was a felony or involved moral turpitude, and the trial court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party. TEX. R. EVID. 609(a).   Petitioner was impeached by prior two prior felony theft convictions and a misdemeanor failure to identify conviction. (R. 6:48-9).   The state habeas court determined that petitioner's prior felony convictions were admissible for impeachment purposes under this rule once petitioner testified at trial, and in federal habeas proceedings, the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d at 395; *Weeks v. Scott*, 55 F.3d at 1063.   Moreover, the misdemeanor was for lying to a police officer, a crime involving moral turpitude.   Petitioner has there failed to show that his attorney was ineffective for failing to make a meritless objection to the admission of these prior convictions.   *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

    *3.  Failure to Cross-Examine*

Petitioner next contends that his trial attorney was ineffective for failing to cross-examine a number of witnesses who testified at the punishment phase of the trial.   Counsel's affidavit states that as a matter of trial strategy, he cross-examined witnesses when he thought it would be helpful to the defense and chose not to cross-examine those witnesses from whom nothing helpful could be obtained. (S.H.Tr.Supp.:2).   The state habeas court found that petitioner had failed to allege what information should have been brought out on cross-examination, the decision to cross-examine witnesses is a matter of trial strategy, and petitioner had failed to meet his burden of proof as to this claim. (S.H.Tr.:131).   The Court of Criminal Appeals denied relief on the merits, and this denial is

24

not contrary to federal law.

The record reflects that trial counsel cross-examined Jewel Sneed, Talitha Kurkpatrick, three of the State's experts, the police officer who responded to the scene, and two of the police officers who assisted in arresting petitioner. (R. 4:43-47, 61; R. 5:9-16, 30-35, 54-6, 67-8, 69, 77-8 104-05, 108-09). A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be "so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)). Petitioner has not shown what further cross-examination would have accomplished or that his attorney's trial tactics in choosing whom to cross-examine were so obviously ill-chosen that his trial was permeated with obvious unfairness.

### 4. Failure to Call Expert Witnesses

Petitioner next contends that his attorney was ineffective for failing to call expert witnesses at trial, including an independent medical examiner, an independent trace evidence analyst, and an independent toolmark expert. Counsel's affidavit states that he hired a forensic psychiatrist to consult with him regarding petitioner's mental status, and the psychiatrist opined that petitioner was competent and sane and that he didn't believe his testimony would be helpful to the defense. (S.H.Tr.Supp.:2). The state habeas court found that petitioner had failed to make any claim about what defense experts in the fields of trace analysis, ballistics, and autopsies would have found, and that counsel was experienced and sufficiently versed in these subject matters. The state habeas court then found that petitioner had failed to meet his burden of proof on this issue. (S.H.Tr.:131-32). The Court of Criminal Appeals denied relief on the merits on the basis of these findings, and this decision is not contrary to federal law.

*5. Closing Argument*

Petitioner next asserts that his attorney was ineffective because his closing argument at the guilt phase of the trial was "rambling, contradictive and unsupportive." In particular, petitioner faults counsel for stating that it was up to the jurors whether they believed petitioner or the State's witnesses, for not giving the jury any reasons to believe petitioner's testimony, and for acknowledging that no State's witness testified that the victim had a gun. (Brief at 34-6). The state habeas court found that petitioner's claim that counsel failed to argue self-defense and failed to point out inconsistencies in the testimony of some state's witnesses is not supported by the record because counsel explained the law of self-defense, asked the jury to find petitioner not guilty on this basis, and argued that some State's witnesses should not be believed. (S.H.Tr.:132). The Court of Criminal Appeals then denied relief on the merits. This denial is not contrary to federal law.

The record from the trial reflects that during his closing statement at the guilt phase of the trial, counsel explained the law of self-defense, including that the law does not limit the number of times someone can be shot in self-defense and it gives a person the right to defend himself until the reasonable apprehension of danger is over. (R. 6:108-110). Counsel also argued that Charles Marshall could not see what was happening clearly from across the street at night, that Talitha Kurkpatrick's testimony was not well understood, and that the photographs did not reflect the actual lighting at the location of the shooting. (R. 6:111-112). Finally, counsel argued that if the jury even had a doubt as to whether petitioner acted in self-defense, it should vote not guilty. (R. 6:112-113). The record indicates that counsel explained the law to the jurors, talked about the believability of the evidence presented by the State, and urged the jury to find petitioner not guilty. Petitioner has not shown that had defense counsel argued longer or in more detail, there is a reasonable probability

that he would have been found not guilty.  The evidence of petitioner's guilt was substantial, and trial counsel was not ineffective in this regard.

**D.**   **Punishment Phase**

Finally, petitioner contends that his trial counsel was ineffective at the punishment phase of the trial for failing to contest the admissibility of extraneous offenses, failing to cross-examine a number of State's witnesses, giving an ineffectual closing argument, and failing to object to the punishment jury charge.

*1. Extraneous Offenses*

As outlined earlier, at the punishment phase of petitioner's trial, the State presented evidence of a number of extraneous offenses committed by petitioner.  Petitioner contends that counsel was ineffective for failing to contest their admissibility.  He further asserts that had he been tried for these offenses and found not guilty, it is likely that they would not have been admissible.  The state habeas court found that the extraneous offenses admitted into evidence at the punishment phase of the trial were admissible under Article 37.07 § 3 of the Texas Code of Criminal Procedure.  The state court therefore concluded that counsel was not deficient for failing to object to their admissibility. (S.H.Tr.:133).

Under 37.07 § 3(a)(1) of the Texas Code of Criminal Procedure , "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act" is admissible at punishment. *See* TEX. CODE CRIM. PROC. ANN. 37.07 § 3(a)(1) (Vernon 2007).  The state habeas court determined that the extraneous offenses were admissible under this statute.  In federal habeas

proceedings, the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d at 395; *Weeks v. Scott*, 55 F.3d at 1063. Although petitioner complains that there was no evidence that he exercised care and control over the weapons found in his grandparents' house, Jewel Sneed, Charles Marshall, and neighbor Georgia Jones testified that he lived there. (R. 4:24-25, 75; R. 7:48). Petitioner does not contest that he lived there, and he presented no evidence that he did not control these weapons. Moreover, the State presented other evidence that petitioner brandished and shot guns that day. Counsel was not ineffective for failing to make a meritless objection.

   *2. Failure to Cross-Examine*

   Petitioner further contends that counsel was ineffective because he failed to cross-examine all of the State's witnesses who testified at the punishment stage of the trial. Counsel's affidavit states that as a matter of trial strategy, he cross-examined witnesses when he thought it would be helpful to the defense and chose not to cross-examine those witnesses from whom nothing helpful could be obtained. (S.H.Tr.Supp.:2). The state habeas court found that petitioner failed to allege what information should have been elicited through cross-examination, the decisions about which witnesses to cross-examine was a matter of trial strategy, and petitioner had failed to meet his burden of proof on this issue. (S.H.Tr.:133). The Court of Criminal Appeals denied relief on the merits based on these findings, and this decision is not an unreasonable application of the *Strickland* standard.

   A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be "so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d at 1172. The record reflects that counsel cross-

examined several of the witnesses who testified at the punishment stage of the trial. (R. 7:22, 44, 49, 64, 73). Petitioner has failed to allege with any particularity how further cross-examination would have benefitted his case, because he presents no evidence that any of the extraneous offenses and prior convictions were, in fact, not true. (Brief at 40). Counsel was not ineffective in this regard.

    *3. Closing Argument*

Petitioner next complains that his attorney failed to provide the jury with mitigating evidence and gave an ineffective closing argument at punishment. The state habeas court found that while petitioner referred to mitigation evidence, his actual complaint is that his attorney did not argue for a life sentence forcefully enough during his closing argument. The state habeas court also found that the argument was a matter of trial strategy and concluded that it did not amount to deficient performance. (S.H.Tr.:133-34). The Court of Criminal Appeals denied relief on this basis, and this denial is not an unreasonable application of the *Strickland* standard.

    When a petitioner challenges counsel's actions during the punishment phase, there must be a reasonable probability that the petitioner's non-capital sentence would have been significantly less harsh but for counsel's alleged errors for relief to be warranted. *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993). Petitioner complains that his attorney failed to present mitigating evidence, failed to argue forcefully against a life sentence, failed to argue that petitioner acted in self-defense, told the jury that he never disagreed with a verdict, did not intend to instruct the jury what the correct verdict should be, and instead stated that petitioner was erratic that day possibly as a result of ingesting cocaine, and that petitioner would not have access to cocaine in prison. (Brief at 43-5). Petitioner does not allege what mitigating evidence existed that should have been presented. Given his extensive criminal history, the facts of the instant case, and the fact that he shot three people

earlier that same day, petitioner has not shown that but for any alleged errors in the closing statement and the failure to present unknown mitigation evidence, he would have received a sentence significantly less than the life sentence he received. Petitioner has failed to establish ineffective assistance of counsel in this regard.

### 4. Jury Charge

Finally, petitioner asserts that his attorney was ineffective for failing to request a jury charge on sudden passion. The state habeas court found that a sudden passion jury charge was not warranted by the evidence because there was no testimony that would have raised petitioner's alleged fear to the level of sudden passion arising from an adequate cause. *See Daniels v. State*, 645 S.W.2d 459 (Tex. Crim. App. 1983). The state habeas court concluded that counsel was not deficient for failing to request this charge. (S.H.Tr.:132-33).

In federal habeas proceedings the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d at 395; *Weeks v. Scott*, 55 F.3d at 1063. Petitioner has neither alleged nor shown that the state habeas court's analysis of state law was incorrect. The denial of this claim on its merits based on the findings of the state habeas court was therefore not an unreasonable application of the *Strickland* standard, as counsel was not deficient for failing to request a jury instruction that was not warranted by the evidence.

In conclusion, petitioner has asserted no claim of ineffective assistance of counsel that entitles him to federal habeas relief.

## VI.  EVIDENTIARY HEARING

Upon review of the pleadings filed herein and the proceedings held in state court as reflected in the state-court records, an evidentiary hearing appears unnecessary.

## VII.  RECOMMENDATION

The Court should **DENY** with prejudice the request for habeas corpus relief brought pursuant

to 28 U.S.C. § 2254.

**SIGNED this 27th day of June, 2009.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on all parties by mailing a copy to each of them.  Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  Failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE